Lynn H. Cate, Plaintiff-Appellee, v. Pagel-Clikeman Co., Inc., an Illinois Corporation, M. Lamont Clikeman and Ralph M. Dickman, Defendants-Appellants.

Gen. No. 66–109.

Second District.

September 25, 1967.

Rehearing denied October 26, 1967.

Miller, Thomas, Hickey and Collins, of Rockford, for appellants.

Williams, McCarthy, Kinley and Rudy, of Rockford, for appellee.

MR. JUSTICE MORAN delivered the opinion of the court.

This case involves forty shares of the common stock of Pagel-Clikeman Co., a farm implement dealer in the City of Rockford. Kenneth Pagel, the President and owner of one-third of the stock, being the forty shares now in issue, died leaving the stock to Barbara A. Welch and Mary J. Murphy. On March 22, 1960, those parties entered into an agreement with the corporation wherein they sold their stock to the corporation for $20,000, $3,000 in cash and $2,000 on April 1 of each year following, with interest on the unpaid balance. The contract further provided that the stock would be assigned to the corporation when fully paid and that during the period of the contract the assets of the corporation would not be sold other than in the ordinary course of business and that those assets and the corporate inventory would be maintained at their customary level. The corporation agreed to furnish monthly statements and further agreed that if it desired to sell its business the sale would be made so as to assure

the selling shareholders of payment. The contract concluded by providing that a breach would "entitle" the selling shareholders ". . . to declare a forfeiture thereof and to retain all monies paid hereunder and to sell any part or all of said stock held by them to make the balance due, . . ." The contract further provided that ". . . in the event it becomes necessary or proper for second parties (here the selling shareholders) to employ attorneys, or to institute suit, to enforce the terms hereof, it is understood and agreed that first party will pay second parties' necessary and reasonable attorneys' fees, costs and expenses incurred by them in enforcing this agreement, and in connection therewith."

As of September 30, 1960, the defendant corporation had an earned surplus of $107,704 reflecting a book value per share of $1,000 or $40,000 for the shares now in controversy.

Following the death of Pagel the two individual defendants became the principal officers of the corporation. They both lent money to the corporation and this was repaid to them.

After the agreement to buy its own shares the corporate defendant fell upon hard times. It lost its farm implement franchise and, finally, in August, 1963, sold the balance of its inventory and equipment at public auction. Thereafter, it repaid the individual defendants for their loans.

In August, 1962, the contract in question was assigned to the plaintiff. However, he received no communications from the defendants despite the fact that they held stockholder meetings during the period in question. Finally, in January of 1964 the plaintiff received a letter from the defendant corporation stating that it would not be able to complete its contract for the purchase of his stock.

Subsequently, the plaintiff brought this suit to obtain specific enforcement of the agreement and for attorney's

fees and for judgment against the individual defendants to pay any deficiency to the extent they receive sums from the sale of the tangible assets of the business.

The trial court found that the agreement was valid and a binding obligation and directed the corporate defendant to perform the contract and pay attorney's fees in the sum of $1,900. In addition the trial court directed the individual defendants to account to the plaintiff for any sums left unpaid by the corporate defendant out of monies paid to them after the auction sale by the corporate defendant.

All defendants appealed, raising three issues. First, that the contract was ultra vires and void. Second, that the contract provided for forfeiture as its exclusive remedy, and third, that the corporation was solvent and none of the defendants had committed any fraudulent acts.

In pursuing their first theory the defendants draw our attention to section 6 of the Business Corporation Act (Ill Rev Stats 1965, c 32, § 157.6), which provides, in part, as follows: "Power of a corporation to acquire its own shares. A corporation shall have power to purchase, take, receive, or otherwise acquire, hold, own, pledge, transfer, or otherwise dispose of its own shares, provided that it shall not purchase, either directly or indirectly, its own shares when its net assets are less than the sum of its stated capital, its paid-in surplus, any surplus arising from unrealized appreciation in value or revaluation of its assets and any surplus arising from surrender to the corporation of any of its shares, or when by so doing its net assets would be reduced below such sum." The defendants argue that this is the only method by which a corporation may purchase its shares and therefore the contract is ultra vires and void.

■ ■ The statute on its face merely grants permission to a corporation to invest in its own shares, the only prohibition being when its net assets are

68

less than its stated capital and surplus or when the purchase would reduce the net assets below the capital and surplus. Subject to this limitation, a corporation may, if it acts in good faith, buy and sell shares of its own stock. Kelly v. McCormick-Murray Mfg. Co., 201 Ill App 308, 313 (1916). The evidence is clear that at the time of the agreement the corporation had an earned surplus of $107,704. The contract obligated it to pay the sum of $20,000, leaving a substantial balance in the surplus account. The court found that there was no violation of the statute, that the corporation had the right to purchase its own shares, and that the contract was not ultra vires. The trial court was correct in that respect.

■ ■ The defendant's next point is that forfeiture was the exclusive remedy. The parties are bound by their own written understanding and this court is bound to observe that understanding. The contract itself provides that a default shall "entitle" the plaintiff to declare forfeiture. The contract further provides that in the event it became necessary or proper for the plaintiff "to employ attorneys or institute suit *to enforce the terms hereof*" (emphasis ours) that the defendant corporation would pay the plaintiff the necessary and reasonable attorney's fees, costs and expenses incurred by him in enforcing the agreement. Without regard to the position that the defendants now take, it is clear that when the parties made the agreement they contemplated that forfeiture was not an exclusive remedy, but merely a remedy in addition to the right to enforce the agreement. As evidence of that we point to the further agreement of the parties that should it be necessary to enforce the agreement, the plaintiff was entitled to receive his attorney fees.

It does not seem to us that the parties could have expressed themselves more clearly. It is obvious that the plaintiff was entitled to a performance of the contract and to receive the promises made by the defendants. The

parties themselves agreed that should the plaintiff be required to enforce those promises, then the plaintiff would be entitled to receive his attorney's fees. The trial judge so ruled and we can find no basis upon which to disagree with his findings.

■ The defendants last point in this court is that the corporation was still solvent at the time of the trial though with funds inadequate to pay the plaintiff, and that neither the corporation nor the individual defendants had committed any fraud. The facts indicate that, following the making of the contract, the business of the corporation steadily declined. It ultimately lost its franchise and conducted an auction sale of its remaining assets. The sale was conducted without the benefit of any notice to the plaintiff and apparently the sale produced sufficient assets to pay off the loans owed to the individual defendants who were shareholders and directors of the corporation.

The contract provided that the plaintiff would be entitled to monthly statements showing the operations of the business. These were not furnished. The contract further provided that, if the corporate defendant sold its business, it would make arrangements to pay the plaintiff. Again, this was not done.

It would be a strange rule of law if the majority shareholders in a corporation could avoid an agreement with another shareholder simply by driving a corporation into insolvency. This is particularly true where the majority shareholders receive all of the funds due them and the only person left unpaid is the minority shareholder who is kept in ignorance of the corporate activities.

The corporation had a contractual duty to report to the plaintiff and to make arrangements to pay him if the business was sold. The majority shareholders were the officers and active directors of the corporation. The majority shareholders, as active directors of the corpora-

tion, and the corporation failed to report and pay the plaintiff, the minority shareholder. Thereby, the majority directors personally profited by their failure. This is not unlike those cases which hold that the directors of an insolvent corporation are trustees for the creditors of the corporation, and that a director who is also a creditor of the corporation cannot lawfully procure or receive any advantage or preference in the payment of his claim at the expense of other creditors. Beach v. Miller, 130 Ill 162, 170, 22 NE 464 (1889) ; Roseboom v. Whittaker, 132 Ill 81, 87, 88, 23 NE 339 (1890) ; and Mayr v. Hodge & Homer Co., 78 Ill App 556, 564 (1898).

In the case at bar the individual defendants repaid themselves over $15,000, thus reducing the corporate assets below the amount due the plaintiff. They then caused the notice to be sent to the plaintiff saying that they could no longer honor their contract. The only reason they could no longer honor their contract was because they had repaid themselves. The whole structure of corporations within our State would totter if such were the law.

We conclude that the trial court was correct in requiring the individual defendants to account to the plaintiff for the sums paid to them by the corporation to the extent necessary to repay the plaintiff, after the exhaustion of the corporate assets, the balance due on the contract plus attorney's fees. The judgment is therefore affirmed.

Judgment affirmed.

DAVIS, P. J. and ABRAHAMSON, J., concur.